377 P.2d 493

**The DENVER AND RIO GRANDE WESTERN RAILROAD COMPANY, a corporation, Plaintiff,**

v.

**PUBLIC SERVICE COMMISSION of Utah and State Road Commission of Utah, Defendants.**

**No. 9727.**

Supreme Court of Utah.

Jan. 8, 1963.

Van Cott, Bagley, Cornwall & McCarthy, Salt Lake City, for appellant.

A. Pratt Kesler, Atty. Gen., Franklyn B. Matheson, Asst. Atty. Gen., Leigh H. Hunt, Salt Lake City, for respondents.

HENRIOD, Chief Justice.

Review of a P.S.C. order sought by the Road Commission to require the railroad to pay 10% of the cost of constructing an overpass above a spur track that crosses present interstate highway 6–50 between Provo and Price, Utah. Affirmed. No costs awarded.[1]

The spur has been used under a private agreement executed some 20 years ago be-

tween the railroad and Illinois Powder Co., predecessor to American Cyanimid Corporation, calling for service to the Powder Co.,—no one else. From 8 to 10 shipments occur each month, requiring the trains to transverse the highway 16 to 20 times monthly. Train crews stop the train and go onto the highway to intercept vehicular travel, permitting passage of the train across the highway. The highway is a busy thoroughfare handling about 2,800 vehicles daily, with 3% or better increase of traffic yearly. At stormy times flares placed by the crew warn motorists of the train's presence. The agreement prevents the Powder Co. and the Railroad from dealing with others in use of the spur trackage. For a portion of the distance closest to the Company's powder plant, it had ownership of the trackage, but did not operate a rail system of its own. The Railroad used its equipment over a roadbed right of way. In 20 years there appears to have been no accident at the crossing. The crossing, however, is in a depressed area below both sides of the regular highway. It would require excessive costs to lower the roadway to the rail crossing level. Even were this

1. The highway involved in this case is part of an interstate highway system in which there is federal participation. It is subject to the provisions of Public Law 85–767, Sec. 1; 72 Stat. 885; Title 23, Chap. 1, Sec. 130(b), U.S.Code, wherein the railroad is deemed to be *benefitted* up to but not to exceed 10% of the construction cost. Title 54–4–15(2), Utah Code

Annotated, 1953, empowers the P.S.C. to order a sharing of the construction costs on projects not participated in by the federal government, whether there is a benefit, no benefit or even where there might be some kind of a detriment to the railroad, the order of the P.S.C. not being unreasonable or capricious.

done the trains would be shunted across the highway at least under present practices. Hazards attending rail-highway intersections generally would not be eliminated as would be done if the overpass were constructed.

Two points are urged on appeal: 1) That the P.S.C. has no jurisdiction to apportion costs of the grade separation in this case, and 2), that, even so, there is no substantial evidence that the railroad will benefit by the overpass.

■ Plaintiff concedes Commission jurisdiction generally under Title 54–4–15(2), Utah Code Annotated 1953, but says it does not apply here. It is urged that under the agreement with the Powder Co. this spur is an isolated operation controlled by the latter. Difficulty is that an agreement of the type here cannot circumscribe nor attach limitations to the powers of the Commission. Under our statutes, and the facts of this case, the Commission no doubt could order service on the spur to others should it be determined in the interest of the public weal, if the order were not arbitrary or capricious. It would be a novel result if the Commission, charged with statutory definitive duties, could be shorn of power over spur outlets extending from a trunk line by a series of private agreements all along the line that would saw off the limbs and leave but the trunk as the subject of supervision and control. In our opinion the spur track here, upon which the Railroad uses its own personnel and equipment, cannot be amputated so as to inoculate the railroad against responsibility by the patronage of one customer, whose purported control over the rail system to its plant, by agreement with the railroad, is not reflected in this record by an application for a certificate of convenience and necessity, nor a showing that it owns and operates privately or internally all the rail facilities.

■ As to the railroad receiving no benefit from the viaduct: It cannot be gainsaid that it would not have to indulge the expensive luxury of stopping and starting its trains 16 to 20 times monthly, use extra time in doing so, and press its personnel into a service as traffic directors. Although no accident has occurred for many years, generally there is the first one. The elimination of this possibility and hazard alone would seem to be of considerable benefit to the Railroad, albeit in a given first or other case it could be demonstrated that the company was free from liability,—what with nuisance values progressively commanding greater premiums. The only question is whether the demonstrated benefit, in some degree or another, reasonably can be said to have at least a value of 10% of the construction cost. We think and hold that although there is an element of conjecture attendant here, under the showing made and the simple facts of our natural, eco-

nomic and industrial life, the Commission was not at all unreasonable in its conclusion, and certainly not capricious,—nor was it unreasonable in setting the cost participation at the maximum federal 10%, as a yardstick for its conclusion in this particular case.

McDONOUGH, CALLISTER and WADE, JJ., concur.

CROCKETT, J., concurs in the result.